## Kelley v. Commonwealth.

(Decided December 3, 1920.) .

### Appeal from Rockcastle Circuit Court.

1. Homicide—Indictment—Sufficiency of New Indictment Found By Grand Jury of County to Which Prosecution Was Removed.— Section 1112 Kentucky Statutes, authorizes the removal of a prosecution where such a state of lawlessness exists in any county that the officers will be prevented from discharging their duty, etc. Section 1115 provides that when the prosecution is so removed, the clerk of the court shall immediately transmit the original papers, together with the transcript of orders pertaining thereto, to the clerk of the court to which the removal is ordered. Section 1117 provides that the court to which the removal is made shall have the same jurisdiction to dispose of the case as the court from which it was removed, and if the indictment be quashed or nolle prosequi entered, a new indictment may be found from time to time by a grand jury of the county to which

the removal is made and the same prosecuted until the case is finally disposed of, as though the offense had been committed in that county. Held, that as the court to which the removal is made acquires jurisdiction by virtue of the order of removal, and the jurisdictional fact is shown by the transcript of the order of removal transmitted to that court, and thus appears of record, an indictment found by the grand jury of the county to which the removal is made is not demurrable because of the failure to allege the removal of the prosecution.

2.  Homicide—Finding of Jury—Sufficiency of Evidence—Evidence. —Evidence in a prosecution for homicide examined and the verdict of guilty held flagrantly against the evidence.

CHARLES I. DAWSON, W. F. HALL, J. T. BOWLING, C. C. WILLIAMS and L. W. BETHURUM for appellant.

W. N. FLIPPIN, S. D. LEWIS and W. C. BROCK for appellee.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY, COMMISSIONER—Reversing.

The grand jury of Harlan county indicted Boyd Kelley and others for the murder of Luther Shipman. On motion of the Commonwealth's attorney, a change of venue to Rockcastle county was granted. Upon the transfer of the case, the indictment was quashed and the case referred to the grand jury of Rockcastle county, which returned an indictment charging Kelley and the other defendants with murder in ordinary terms, and also with a conspiracy to commit the murder. The defendants, other than Kelley, interposed a demurrer to the indictment. The demurrer was sustained and the indictment dismissed. Thereafter, Kelley was tried and the jury found him guilty and fixed his punishment at ten years in the penitentiary. Kelley appeals.

It is first insisted that appellant's demurrer to the indictment should have been sustained, because it showed that the offense was committed in Harlan county and failed to allege any facts showing the jurisdiction of the grand jury of Rockcastle county. In other words, it is argued that the indictment itself should have stated that defendant was originally indicted in Harlan county, and that a change of venue was granted to Rockcastle county, and that without these allegations it would appear that the grand jury of Rockcastle county had indicted the defendant for an offense committed in another county. The removal was granted because there existed in Harlan county such a state of lawlessness that the officers

would be prevented from discharging their duty, or the jurors be deterred from rendering an impartial verdict, and the applicable sections of the statutes are as follows:

Section 1112. "Whenever any judge shall be satisfied from his own knowledge, and from the written statement of the Commonwealth's attorney, that such a state of lawlessness exists in any county that the officers will be prevented from discharging their duty or the jurors be deterred from rendering an impartial verdict, he may order the prosecution removed to some other county in which a fair trial can be had; and the fiscal court of the county from which such removal is made shall allow and pay the cost thereof out of the county levy."

Section 1115. "When the prosecution is so removed, the clerk of the court shall immediately transmit the original papers, together with a transcript of the orders pertaining thereto, to the clerk of the court to which the removal is ordered, after making out and retaining a copy of such original papers. The transfer shall be made by the clerk, his deputy or some discreet person for whom the clerk shall be responsible. The applicant, if the defendant, shall, before such order of removal is made, pay the clerk for making such copy, and also ten cents a mile for necessary travel in going and returning in making such transfer."

Section 1117. "The court to which the removal is so made shall have the same jurisdiction to dispose of the case as the court has from which it was removed; and if the indictment be quashed or *nolle prosequi* entered, a new indictment may be found, from time to time, by a grand jury of the county to which the removal is made, and the same prosecuted until the case if finally disposed of, as though the offense had been committed in that county."

It will be observed that these sections authorize the removal of a case and require the clerk of the court where the case is pending to transmit the original papers, together with the transcript of the orders pertaining thereto, to the clerk of the court to which the removal is ordered; and when the removal is so made, the court to which the change of venue is granted has the same jurisdiction to dispose of the case as the court from which it is removed, and if the indictment be quashed, or *nolle prosequi* entered, a new indictment may be found from time to time by a grand jury of the county

to which the removal is made, and the same prosecuted until the case is finally disposed of, as though the offense had been committed in that county. Thus, the court to which the removal is made acquires jurisdiction by virtue of the order of removal, and since the jurisdictional fact is shown by the transcript of the order of removal transmitted to that court, and thus appears of record, we perceive no reason why the same jurisdictional fact should also appear in the indictment which the grand jury of the county to which the removal is ordered is authorized to find. It follows that the demurrer to the indictment was properly overruled.

A more serious contention is that the verdict is flagrantly against the evidence. The record discloses that trouble arose between certain miners of Harlan county who wished to continue at work, and others who desired to go on a strike, and it was claimed that the latter began to intimidate the former. The trouble continued until finally warrants were issued for the intimidating miners and placed in the hands of the sheriff of Harlan county to execute. The sheriff went to the Coxton mines, which were located a few miles from Harlan, for the purpose of making the arrests. The parties for whom the warrants were issued refused to be arrested or to accompany the sheriff, but agreed to go to Harlan and give bond for their appearance for trial. On the way there they were joined by a large number of persons. When they reached Harlan they refused to surrender to the sheriff, but marched around the court house while the circuit court was in session, and returned to the mines. The circuit court then empaneled a special grand jury which indicted a large number of miners at the Coxton mine, including Luther and Grant Shipman, and bench warrants for those indicted were placed in the hands of the sheriff for execution. Being sick at the time, the sheriff summoned his deputies and put them in charge of John A. Ward, county judge of Harlan county, and directed them to arrest the parties named in the indictment. In the meantime, the sheriff called up the leader of the miners and requested them to surrender, but was notified that they would not do so and that they did not intend to be arrested. Thereupon, the sheriff selected a posse to accompany Ward to the mines. The appellant, Boyd Kelley, was a deputy sheriff. He was sick at the time and asked to be excused from service, but the sheriff insisted on his going,

which he finally consented to do. The miners who had been indicted had gone into the mountains heavily armed, and arrangements were made whereby three shots were to be fired in order to warn them of the approach of the posse. When the officers appeared at the Shipman home between ten and eleven o'clock, the warning shots were fired, and soon thereafter several shots were fired from the mountain side in the direction of the officers, as well as several shots by the officers themselves. During the trouble, Luther Shipman and Grant Shipman were killed. At this point there is a sharp conflict in the evidence. Dora Shipman, the wife of Luther Shipman, testified that some men came to the door. Her brother, Grant Shipman, arose and told them that if they would wait a minute he would open the door. At that time Luther Shipman was in bed asleep. John A. Ward and Boyd Kelley entered the room and Kelley told Grant Shipman that he had a warrant for him. Grant said, "I can't go tonight; I am crippled and will come in the morning if you want me to." He then laughed and said, "I was just teasing you." The witness then woke up Luther Shipman. Boyd Kelley told him he had a warrant for him and searched him as he put on his clothes. Luther said, "You are welcome to search me; I never even carry a pocket knife no time." When her husband got his clothes on, he turned around and got his cap off the wall and put it on. While he had his back to Kelley, Kelley said, "We have got men enough to clean up the hollow; we have come to clean up the hollow," witness adding, "He meant to kill the men out, you know." An objection to the latter statement was sustained. Then the shooting commenced on the outside. At that time Ward had gone out. Kelley then put the pistol to her husband's head and shot him, and as he walked out he put the pistol up against her brother's left arm and shot him. Kelley said to her brother, "What did you resist for?" Her brother replied, "I didn't resist." Just then there was a volley of shots, a hundred or more, and witness thought they would kill them all. Witness also stated that Boyd Kelley had on a light hat. Sarah Shipman, the mother-in-law of Luther Shipman, told practically the same story. She further stated that both the men who came into the room wore broad brimmed white hats. By way of contradiction it was shown that both these witnesses testified before the coroner's jury, at an inquest held in Harlan county

shortly after the homicide, and both stated that Rockingham Smith was the man who did the killing, and the coroner's jury so found. It was further shown that Dora Shipman stated, in the presence of reputable witnesses, that John A. Ward was the man who did the killing and pointed him out as the man. After that she stated that Mose Burkheart looked more like the man who did the killing than John Ward. It was also shown that, at a former trial in Harlan county, Sarah Shipman was asked to identify the man who did the killing. Four men arose. She first pointed out Rockingham Smith. Then the crowd began to laugh and she said, "No, that is not the man." Then she picked out Charlie Turner. The crowd again laughed and she said, "No, that ain't him either. The man kept his back to me all the time. I couldn't get to see his face. I don't know whether I could tell the man or not." She then indicated Judge Bailey, and finally pointed out Boyd Kelley as the man. It was further shown that neither Smith, Turner nor Bailey resembled Kelley, and also that Mose Burkheart did not look like him. It likewise appeared from the testimony of several witnesses that Kelley did not have on a white hat on the night of the homicide, but wore a cap which he purchased in Harlan.

After detailing the circumstances under which the posse was summoned, and what occurred prior to the time they reached the Shipman house, Kelley testified that he was not in the house at any time, and denied every fact testified to by the Shipman women. John A. Ward, the county judge who headed the posse, testified that he went to the door of the Shipman house and knocked on the door three or four times. Grant Shipmen got up, opened the door and turned on an electric light. Ward then stepped inside the door and saw Luther Shipman and his wife in bed. He told Shipman he had a warrant for him and to get up and dress. Ward then stepped out on the porch to wait until he got up. There were some of the crowd at the door and on the porch and Boyd Kelley did not go in the house with him, nor was he on the porch. While witness was on the porch, he saw a man approaching. The man told him they had a prisoner. He then went down and saw Boyd Kelley, Winfield Laxton and Moses Burkheart. Burkheart lit some matches so that witness could read the warrants and see if Winfield Laxton's name was in them. Four or five shots were fired up above the Shipman house.

Some shots were fired from the mountains towards the posse, and the posse also fired several shots. Moses Burkheart also testified to the fact that Kelley was with him when the firing began. Other witnesses testified to substantially the same facts.

The court properly ruled that the evidence of a conspiracy was not sufficient to take the case to the jury. All the testimony shows that Kelley and the other members of the posse went to the Coxton mine for the lawful purpose of executing the warrants of arrest which had been placed in their hands, and there was not a single speech or act on the part of the members of the posse tending to show, or any circumstance from which it could be reasonably inferred, that they went to the Shipman home for the purpose of committing murder. That being true, the whole case turns on whether Kelley went into the house and killed the Shipmans as narrated by the Shipman women. Though they now say that Kelley was the man, they are both positive that the man who entered the house wore a white hat, while it is shown that Kelley wore a cap. Not only so, but they each deposed at the corner's inquest that Rockingham Smith was the man. After that they each stated that Boyd Kelley was not the man and pointed out John A. Ward and others as the man. Moreover, Sarah Shipman, in trying to identify the man who did the killing first pointed out three other men, and did not point out Kelley until the crowd laughed and thereby indicated that she had made a mistake. It is not our rule, of course, to disturb the verdict of a jury on the ground that the numerical weight of the testimony is on one side or the other, but in a case like this, where several witnesses who knew the accused are positive that he was not in the house where the homicide took place, and the testimony to the contrary is given by two witnesses who are impeached by statements and conduct showing that they were merely guessing as to the identity of the person who committed the crime, it seems to us that there is no escape from the conclusion that the verdict is flagrantly against the evidence.

Complaint is also made of the fact that the Commonwealth's attorney, in making his argument to the jury, went outside of the record, but as probably this will not occur on another trial, we refrain from comment.

Judgment reversed and cause remanded for a new trial consistent with this opinion.